# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# CIVIL CASE NO. 1:17-cv-00054-MR-DLH

| | |
|---|---|
| CECILIA D. WALTON, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>N.C. DEPARTMENT OF COMMERCE, )<br>)<br>Defendant. )<br>_____ ) | **MEMORANDUM OF DECISION AND ORDER** |

**THIS MATTER** is before the Court on the Defendant's Motion to Dismiss [Doc. 22].

## I. PROCEDURAL BACKGROUND

On February 21, 2017, the Plaintiff Cecilia D. Walton, proceeding *pro se*, filed this action against her former employer, the North Carolina Department of Commerce. [Doc. 1]. As stated in her Second Amended Complaint [Doc. 21], the Plaintiff asserts claims of retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-2(a)(1), *et seq.* ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. §§ 623, *et seq.* ("ADEA"), a claim of age discrimination under the ADEA, and state law claims for tortious interference, breach of contract, payment of wages, and blacklisting.

On July 28, 2017, the Defendant filed the present Motion to Dismiss [Doc. 22], seeking dismissal of this action pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). On August 7, 2017, the Plaintiff filed her Brief in Opposition. [Doc. 24].

Having been fully briefed, this matter is ripe for disposition.

## II. FACTUAL BACKGROUND

Taking the well-pleaded allegations of the Plaintiff's Second Amended Complaint as true, the following is a summary of the relevant facts.

The Plaintiff is a forty-nine-year-old female. [Doc. 21 at ¶ 7]. In 2002, the Plaintiff was hired by the Employment Security Commission ("ESC"), a division of the Defendant North Carolina Department of Commerce, as a claim adjudicator. [Id. at ¶ 8].

In March 2004, the Plaintiff filed an EEOC charge against ESC for sex discrimination. [Id.]. In April 2004, the Plaintiff resigned from ESC, in part due to a hostile work environment following the Plaintiff's return from maternity leave. [Id. at ¶ 9]. On December 9, 2009, the Plaintiff was hired by the Division of Workforce Solutions ("DWS"), another division of the North Carolina Department of Commerce, to work in its Charlotte South office as an intermittent (part-time) employee. [Id. at ¶¶ 10, 42]. The Plaintiff received

positive feedback from her DWS Charlotte South supervisor. [Id. at ¶¶ 15, 46]. The Plaintiff never received any disciplinary actions. [Id. at ¶ 46].

In September 2010, the Plaintiff requested and received a transfer to the main DWS office in Charlotte ("Charlotte Main"). [Id. at ¶ 16]. The Plaintiff's supervisors at Charlotte Main were Area Manager Randall Darnell ("Darnell") and Assistant Office Manager Stephanie Lattimore ("Lattimore"). [Id.]. The Plaintiff was assigned to the Claims Unit and worked alongside two other claims specialists. [Id. at ¶¶ 17-18].

In December 2010, DWS hired Roderick Bailey (Bailey), a former Charlotte-Mecklenburg police officer. [Id. at ¶ 19]. In January 2011, Bailey asked the Plaintiff for her phone number because he wanted to date her. [Id. at ¶ 20]. The Plaintiff refused. [Id.]. Soon thereafter, Bailey asked the Plaintiff out to lunch. [Id. at ¶ 21]. The Plaintiff initially accepted but changed her mind. [Id.]. Bailey became mad toward the Plaintiff. [Id. at ¶ 21].

Bailey began to ridicule the Plaintiff in front of others, including referring to her as "Celeto," an inside office euphemism for an unmarried older woman. [Id. at ¶ 22]. Further, Bailey used false and slanderous information to convince other male employees to "start friendships" with the Plaintiff. [Id. at ¶ 22]. Lattimore called the Plaintiff out at meetings and made derogatory statements toward her. [Id. at ¶ 26]. On one occasion, Lattimore made the

Plaintiff feel unwelcome at the annual office Christmas party. [Id.]. Lattimore referred to herself as "mulatto" in office conversations, in contrast to the Plaintiff being dark-skinned. At one office meeting, Lattimore stated that babies and small children were not to be brought to the office because they were a distraction. [Id. at ¶ 27].

From 2011 to 2012, the Plaintiff made a series of complaints about Lattimore and Bailey to Darnell both in person and via email but Darnell did nothing. [Id. at ¶ 28]. The Plaintiff dropped her first complaint because she was afraid of retaliation; however, due to escalating treatment the Plaintiff filed another complaint. [Id.].

Beginning in 2011, contemporaneously with the office harassment, the father of the Plaintiff's child began to make harassing phone calls to the Plaintiff. [Id. at ¶ 25]. In December 2011, the harassment escalated and the Plaintiff filed a report with local police. [Id. at ¶ 30]. The Plaintiff's child's father began to call DWS and contact one of the Plaintiff's coworkers in order to keep tabs on the Plaintiff. [Id.]. The Plaintiff complained to Darnell, but Darnell failed to take any action and failed to offer to "institute a restraining order per state policy on workplace violence in Plaintiff's behalf." [Id.]. The Plaintiff obtained an initial *ex parte* restraining order against her former partner but was repeatedly denied a permanent restraining order. [Id. at ¶

31]. The Plaintiff alleges that her child's father, by himself and through agents, interfered with her job, including contacting prospective employers and altering online networking profiles. [Id. at ¶¶ 32–33].

In January 2013, the Plaintiff felt increased scrutiny and harassment at work. [Id. at ¶¶ 35-36]. The Plaintiff was watched at lunch; followed outside on lunch and breaks; constantly teased; and her car was broken into. [Id. at ¶ 35]. The Plaintiff, believing that Lattimore was behind the harassment, reported Lattimore to Darnell but no investigation took place. [Id. at ¶ 35].

Also beginning in January 2013, the Plaintiff discovered a breach of her cellphone account. [Id. at ¶ 37]. Specifically, the Plaintiff asserts that Lattimore cloned and intercepted the Plaintiff's cellphone without her knowledge or authorization. [Id.]. The Plaintiff reported this to the Defendant's integrity unit; however, the Plaintiff was told that the unit could not investigate unless she sought a restraining order against Lattimore. [Id. at ¶ 38]. The Plaintiff also reported the cellphone interception to Darnell. [Id. at ¶ 39].

In March 2013, the Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging "race, color, sex, and retaliation discrimination" against ESC, Lattimore, and Bailey. [Id. at ¶ 40]. In June 2013, Plaintiff applied and interviewed for a job as an

unemployment fraud investigator with the Defendant — a job that entailed many of the same duties as the Plaintiff was doing at the Charlotte Main office. [Id. at ¶¶ 40–42]. A few months later, the Plaintiff filed another EEOC charge against ESC based on allegations that Lattimore gave unfavorable references to the Plaintiff's prospective employers. [Id. at ¶ 40]. The Plaintiff also asserts that Lattimore gave her a poor reference that prevented her from gaining permanent employment with ESC. [Id. at ¶ 41]. The Plaintiff also avers that her lack of permanent employment status precipitated her being laid off in August 2013. [Id. at ¶ 41]. The Plaintiff applied for another job in Georgia, but Lattimore gave the Plaintiff an unfavorable reference, thereby preventing her from being hired for that position. [Id. at ¶ 43]. Since being laid off, the Plaintiff has applied for numerous jobs within the North Carolina Department of Commerce. [Id. at ¶ 61]. The Plaintiff has not been offered an interview for any job in the Charlotte area. [Id.].

In February 2015, Plaintiff filed another EEOC charge alleging retaliation after being denied an interview for an unemployment insurance claims specialist in the Charlotte claims call center. [Id. at ¶ 62].

In September 2016, Plaintiff had a job interview for a career advisor position with the DWS office in Shelby, North Carolina, and was verbally offered the job by Lawrence Roseboro (Roseboro). [Id. at ¶¶ 64, 93-95].

6

Roseboro told the Plaintiff that he needed to leave the job posted because he had to hire for two positions. [Id. at ¶ 95]. Roseboro told the Plaintiff that he would contact her later to set a start date. [Id.]. In October 2016, the Plaintiff began calling both Roseboro and DWS Assistant Manager Will Collins ("Collins") regarding the start date of the position. [Id. at ¶ 99]. On one occasion, Roseboro told the Plaintiff that "he had not heard anything from Raleigh about [her] start date." [Id. at ¶ 99]. In December 2016, the Plaintiff emailed Collins to explain the situation between her and Lattimore. [Id. at ¶ 67]. In her email, the Plaintiff mentioned that she had applied for other various Charlotte jobs and was not offered interviews. [Id.]. In late December 2016, Collins emailed the Plaintiff and told her that he had found no problems with DWS's hiring or the Plaintiff's applications. [Id. at ¶ 69]. Ultimately, in January 2017, Plaintiff was formally denied rehire via email from the Defendant's Human Resources Department. [Id. at ¶ 70].

On January 10, 2017, after seeing that the career advisor job posting had not been taken down, the Plaintiff contacted Roseboro and reapplied for a position with Defendant for a third time "as a formality." [Id.]. On May 5, 2017, the Plaintiff received another email from Defendant's Human Resources Department stating that another candidate had been chosen. [Id. at ¶¶ 71, 101].

On January 11, 2017, the Plaintiff filed another charge with the EEOC, alleging that Roseboro's refusal to hire her was in retaliation for her filing EEOC charges in 2013 and 2015. [Doc. 1 at 7]. On January 23, 2017, the EEOC issued the Plaintiff a Notice of Right to Sue. [Id. at 8].

## II. STANDARD OF REVIEW

### A. Rule 12(b)(1)

A motion to dismiss based on Federal Rule of Civil Procedure 12(b)(1) addresses whether the Court has subject-matter jurisdiction to hear the dispute. See Fed. R. Civ. P. 12(b)(1). Where a defendant contends that a complaint fails to allege facts upon which the Court can base subject matter jurisdiction, the Court must assume as true the factual allegations in the complaint. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). If, however, the defendant contends that the jurisdictional allegations contained in the complaint are false, the Court may go beyond the allegations of the complaint and conduct an evidentiary hearing in order to determine if there are facts to support the Court's exercise of jurisdiction over the dispute. Id. The burden of establishing subject matter jurisdiction on a motion to dismiss rests with the party asserting jurisdiction. Id.; Williams v. United States, 50 F.3d 299, 304 (4th Cir. 1995).

## B. Rule 12(b)(6)

The central issue for resolving a Rule 12(b)(6) motion is whether the claims state a plausible claim for relief.  See Francis v. Giacomelli, 588 F.3d 186, 189 (4th Cir. 2009).  In considering a Rule 12(b)(6) motion, the Court accepts the allegations in the complaint as true and construes them in the light most favorable to the plaintiff.  Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009); Giacomelli, 588 F.3d at 190–92.  Although the Court accepts well-pled facts as true, it is not required to accept "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement…."  Consumeraffairs.com, 591 F.3d at 255; see also Giacomelli, 588 F.3d at 189.

The claims need not contain "detailed factual allegations," but must contain sufficient factual allegations to suggest the required elements of a cause of action.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); see also Consumeraffairs.com, 591 F.3d at 256.  "[A] formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555.  Nor will mere labels and legal conclusions suffice.  Id.  Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

The complaint is required to contain "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570; see also Consumeraffairs.com, 591 F.3d at 255. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. See also Consumeraffairs.com, 591 F.3d at 255. The mere possibility that a defendant acted unlawfully is not sufficient for a claim to survive a motion to dismiss. Consumeraffairs.com, 591 F.3d at 256; Giacomelli, 588 F.3d at 193. Ultimately, the well-pled factual allegations must move a plaintiff's claim from possible to plausible. Twombly, 550 U.S. at 570; Consumeraffairs.com, 591 F.3d at 256.

## III. DISCUSSION

### A. State Law Claims and Sovereign Immunity

The Defendant moves to dismiss the Plaintiff's state law claims of tortious interference, breach of contract, payment of wages, and blacklisting on the grounds that such claims are barred by sovereign immunity.

The Eleventh Amendment deprives federal courts of any jurisdiction to hear state law claims by private parties against states.[1] See Pennhurst State

---

[1] It is undisputed that the Defendant is a state agency. See N.C. Gen. Stat. § 143B-427, et seq. (establishing Department of Commerce as a North Carolina agency). As such, a suit against the Department of Commerce constitutes a suit against the State of North

10

Sch. & Hosp. v. Halderman, 465 U.S. 89, 104-106 (1984). The Eleventh Amendment applies with its full sweep to bar any relief, whether legal or equitable. Id. at 106. The bar includes pendent state law claims as well as all federal claims, except in those cases where Congress has expressly abrogated the states' Eleventh Amendment rights. See Huang v. Board of Governors of Univ. of N.C., 902 F.2d 1134, 1138 (4th Cir. 1990).

A state may waive the protection of the Eleventh Amendment by state statute or state constitutional provision. Edelman v. Jordan, 415 U.S. 651, 673-74 (1974). Any such waiver, however, must be clearly and unequivocally expressed. Huang, 902 F.2d at 1138. As the Supreme Court has explained:

> If a State waives its immunity and consents to suit in federal court, the suit is not barred by the Eleventh Amendment. But because "[c]onstructive consent is not a doctrine commonly associated with the surrender of constitutional rights," the Court will find a waiver by the State "only where stated 'by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction.'" Moreover, "[a] State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued. Thus, a State does not waive Eleventh Amendment immunity in federal courts merely by waiving sovereign immunity in its own courts.

---

Carolina.

11

Welch v. Texas Dep't of Highways & Pub. Transp., 483 U.S. 468, 473-74 (1987) (citations omitted). In order to constitute a waiver, "the statute must specify the state's intention to be sued in federal court." Huang, 902 F.2d at 1138-39.

Under North Carolina law, the State may waive immunity by entering into a valid contract. Smith v. State, 289 N.C. 303, 322, 222 S.E.2d 412, 423-24 (1976). The fact that North Carolina has waived its sovereign immunity against breach of contract claims brought in its own state courts, however, does not constitute a waiver of Eleventh Amendment immunity. Welch, 483 U.S. at 473; Huang, 902 F.2d at 1139 n.5. Because North Carolina has not waived immunity to be sued in federal court for breach of contract, the Plaintiff's breach of contract claim must be dismissed.

The North Carolina Tort Claims Act, N.C. Gen. Stat. § 143-291 *et seq.*, "effects a limited waiver of State sovereign immunity for negligent acts by state employees in their official capacities." Alston v. N.C. A&T State Univ., 304 F. Supp. 2d 774, 783 (M.D.N.C. 2004). The Tort Claims Act, however, does not waive sovereign immunity for intentional torts. Kawai Am. Corp. v. Univ. of N.C. at Chapel Hill, 152 N.C. App. 163, 167, 567 S.E.2d 215, 218 (2002). Tortious interference is an intentional tort for which the state cannot be sued. See Blue Ridge Pub. Safety, Inc. v. Ashe, 712 F. Supp. 2d 440,

447 (W.D.N.C. 2010) (recognizing that doctrine of governmental immunity shields public officers acting in their official capacities, but that such officers may be held personally liable for actions that "corrupt, malicious or perpetrated outside and beyond the scope of official duties"). Because the state has not waived immunity for intentional torts, any tortious interference claim raised by the Plaintiff also must be dismissed.

As for the Plaintiff's wage claim, North Carolina is exempt from the provisions of the North Carolina Wage and Hour Act (NCWHA), N.C. Gen. Stat. 95-25.1, *et seq.* The NCWHA establishes the public policy for the State of North Carolina that attempts to balance a competitive business environment with "wage levels of employees, hours of labor, payment of earned wages, and the well-being of minors…." N.C. Gen. Stat. § 95-25.1. The NCWHA contains a number of exemptions from its provisions and includes a broad exemption for the State of North Carolina from most of its provisions. See N.C. Gen. Stat. § 95-25.14(d) (stating that the provisions of the NCWHA do not apply to the State of North Carolina or any "State or local agency or instrumentality of government"). The provisions of the NCWHA which do apply to the State and its agencies are limited to the minimum wage provisions, definitions, and the complainant protections in N.C. Gen. Stat. § 95-25.20. N.C. Gen. Stat. § 95-25.14(d).

In this case, Plaintiff's claims brought under the NCWHA provisions dealing with wage payments, disputed wages, and withholding of wages, payment to separated employees, and other related claims do not arise from the limited provisions that apply to the State under the NCWHA. See Johnson v. North Carolina Dep't of Transp., 107 N.C. App. 63, 70, 418 S.E.2d 703, 704 (1992) (holding that plaintiff's claim under the State Wage and Hour Act did not afford him the remedy sought as the statute expressly exempts any State agency from its overtime compensation provisions); Newber v. City of Wilmington, 83 N.C. App. 327, 331, 350 S.E.2d 125, 127 (1986) (holding that attorney's fees provisions of N.C. Gen. Stat. § 95-25.22(d) did not apply to defendant since it was explicitly exempted by N.C. Gen. Stat. § 95-25.14). The broad exemption for the State and its agencies applies to the NCWHA claims raised in the Plaintiff's Second Amended Complaint, and therefore, these claims are also dismissed.

Finally, with respect to the Plaintiff's blacklisting claim, the Plaintiff has not identified any manner in which Congress or the State of North Carolina has waived the state's Eleventh Amendment immunity from suit on such a claim. Accordingly, this claim too must be dismissed.

In summary, Plaintiff alleges that she has been blacklisted from employment, that the Defendant has tortiously interfered with her

employment, that the Defendant has breached an employment contract with her, and that she is owed wages. The Defendant, as a state agency, has not waived its sovereign immunity with regard to any of these claims, and the Plaintiff has not alleged that the Defendant has waived such immunity. Because the Defendant is protected by sovereign immunity, this Court does not have jurisdiction over these claims. For these reasons, the Plaintiff's state-law claims of tortious interference, breach of contract, payment of wages, and blacklisting are dismissed.

**B. Age Discrimination Claim and Failure to Exhaust Administrative Remedies**

The Defendant moves to dismiss the Plaintiff's age discrimination claim on the grounds that the Plaintiff has failed to exhaust her administrative remedies, thereby depriving this Court of subject matter jurisdiction over her claim.

In claims under the ADEA, a failure to exhaust administrative remedies deprives a federal court of subject matter jurisdiction over the claim. Jones v. Calvert Grp., Ltd., 551 F.3d 297, 300-01 (4th Cir. 2009). The ADEA requires that before filing a civil action alleging a violation of the ADEA, a person must first exhaust administrative remedies by filing a charge of discrimination with the EEOC. 29 U.S.C. § 626(d); Jones, 551 F.3d at 300-01. Any subsequent civil action after filing a charge with the EEOC is limited

to the contents of the charge. Jones, 551 F.3d at 300. "Only those discrimination claims stated in the initial charge, those reasonable related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent . . . lawsuit." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996). "[A] claim in formal litigation will generally be barred if the EEOC charge alleges discrimination on one basis, such as race, and the formal litigation claim alleges discrimination on a separate basis, such as sex." Jones, 551 F.3d at 300.

In the EEOC charge that led to this lawsuit, the Plaintiff alleges only a retaliation claim. The box for asserting an age discrimination claim is left unchecked, and she makes no allegations within the charge to support a claim of age discrimination. [Doc. 1 at 7]. Thus, the Court must conclude Plaintiff has not exhausted her administrative remedies as required by 29 U.S.C. § 626(d). Accordingly, the Court does not have subject matter jurisdiction over this claim. The Plaintiff's age discrimination claim under the ADEA is therefore dismissed.

### C.     Plaintiff's Retaliation Claim

The Defendant moves to dismiss the Plaintiff's retaliation claim for failure to state a claim upon which relief may be granted.

Count One of the Plaintiff's Second Amended Complaint is a claim of retaliation citing both the ADEA and Title VII. To state a claim for Title VII retaliation, the Plaintiff must allege: (1) that she engaged in protected activity; (2) that her employer took an adverse employment action against her; and (3) that there is a causal connection existed between the protected activity and the asserted adverse action. Coleman v. Maryland Ct. of App., 626 F.3d 187, 190 (4th Cir. 2010). When analyzing retaliation claims under the ADEA, courts employ the same standards used in analyzing retaliation claims under Title VII. See Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998).

While the Plaintiff has pled sufficient facts to plausibly allege that she filed multiple EEOC charges and that she was not hired for a job for which she was qualified (the DWS career advisor position in Shelby), she has failed to plausibly allege a causal connection between her protected activity and the Defendant's failure to hire her. First, Roseboro's failure to hire the Plaintiff came more than one year after she filed the last of her EEOC charges. This period of time is simply "too long to establish a causal connection by temporal proximity alone." Pascual v. Lowe's Home Centers, Inc., 193 F. App'x 229, 233 (4th Cir. 2006) (finding no causal connection where plaintiff was terminated three to four months after protected activity).

Further, the Plaintiff has failed to allege that Roseboro, or any other decision maker involved in the decision not to hire her for the career advisor position, had any knowledge of her prior protected activity. See Ramos v. Molina Healthcare, Inc., 963 F. Supp. 2d 511, 528 (E.D. Va. 2013) (granting summary judgment to employer where plaintiff failed to show that decisionmaker had any knowledge of plaintiff's "protected activity," that being prior meetings with company's human resource manager).

The Plaintiff's Second Amended Complaint outlines a vivid conspiracy against her, primarily orchestrated by Lattimore. The Plaintiff, however, has failed to present any plausible allegation that Roseboro or any other decisionmaker received any communication from Lattimore or anyone else about such protected activity. The Plaintiff simply alleges that Lattimore gave her "bad reference[s]." [Id. at ¶ 41]. In light of the Plaintiff's allegations, the Court cannot reasonably infer that Roseboro or any other decisionmaker had knowledge of the Plaintiff's prior protected activity and took adverse action against her because of it.

As the Plaintiff has failed to state a plausible claim for retaliation, her retaliation claims under both the ADEA and Title VII are hereby dismissed.

**O R D E R**

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion to Dismiss [Doc. 22] is **GRANTED**, and this case is hereby **DISMISSED**.

**IT IS SO ORDERED.**

Signed: March 16, 2018

Martin Reidinger
United States District Judge